NEWPORT *v.* CHANDLER.

4-7268                                        178 S. W. 2d 240

Opinion delivered February 28, 1944.

*F. E. Riddle* and *R. R. Linker,* for appellant.

*Robert L. Butt,* for appellee.

KNOX, J. The primary question presented by this appeal is whether under the circumstances disclosed by the record a warranty deed and a contract permitting

the grantors to reacquire title constituted a mortgage. The contract was signed by appellant, W. E. Newport, and the appellee, and provides that appellants: "have agreed to sell and have sold to the party of the second part (appellee) and the party of the second part has agreed to purchase and has purchased the following described property, to-wit:

"Front lot 2 and 2 feet off the east side of front lot 3 on the south side of south Main street; front lot 2 and 2 feet off the east side of front lot 3 on the north side of First street, south of Main street, extending from Main street to First street in block 156, Riley & Armstrong's Survey in the city of Eureka Springs."

The consideration of the above sale is $900 cash in hand, and the parties hereto agree as follows: "The said parties of the first part are to execute and deliver to the party of the second part a warranty deed to the above property together with the abstract of title, and same are to be held by the firm of Bare & Swett as an escrow item with the understanding and agreement that in the event the said parties of the first part (appellants) desire to do so, they can repurchase the property from the party of the second part at and for the sum of $900 plus 8 per cent. interest, provided, however, that they must make such purchase on or before nine months after this date. In the meantime, the parties of the first part bind themselves to maintain adequate insurance on said property to protect at least the value of the principal and interest mentioned herein and to pay all taxes legally assessed against said property during such period of time.

"If the parties of the first part should fail or refuse to comply with all the stipulations hereinbefore mentioned at any time and during the life of this contract, then they hereby authorize the said Bare & Swett to deliver the deed and abstract to the party of the second part and bind themselves to promptly surrender possession of the property hereinbefore described to said party of the second part.

"Made in triplicate, a copy to be held by each of the parties hereto and one by the firm of Bare & Swett."

On the same day appellants executed the warranty deed, which together with a copy of the contract was delivered to the escrow agent.

At the expiration of the nine months period mentioned in the contract, to-wit, July 19, 1941, appellants were unable to pay the $900 and interest, and appellee agreed to extend the time, as evidenced by an indorsement on the copy of the contract left with the escrow agent, as follows: "July 19, 1941. I hereby agree to extend the payment of the within obligation to September 1, 1941, provided that all furnishings are left in the rooms on the top floor of the building and in all the rooms on the left side of the main entrance from the Spring street floor in order that said rooms may be available to rent. It is further understood that all bath fixtures that are not disconnected are to remain as part of the building and are so considered.

"E. J. Chandler.

"Accepted: W. E. Newport."

The property described in the contract consisted of a lot located in Eureka Springs, Arkansas, upon which is situated a brick and stone building, known as the Basin Springs Bath House. This building, erected some 40 or 50 years ago, is 42 feet wide by 80 feet in length, and consists of a basement and three stories. The building is situated on a mountain side, and the first story thereof consists of two-store buildings, which front on and are entered from Main street. The second and third stories of the building consist of rooms which originally were used in connection with the operation of a bath house. The second story of the building is on a level with Spring street, which is higher up the mountain side than Main street. A bridgeway extends from the building across Main street to Spring street so that the second story of the building can be entered directly from Spring street. The evidence is undisputed that the building

originally was well constructed, and that the cost of such construction was quite large.

Appellants had owned said building for about 20 years, and operated a grocery store and meat market on the first floor thereof, and occupied some of the rooms on the second floor as living quarters. The building was in poor repair. Appellants were indebted to a bank in Eureka Springs in the sum of $600, secured by a mortgage on this building. Newport undertook to obtain a renewal of the indebtedness and sought also to have the principal of the loan increased to $1,000. The bank declined to grant him the increase and also insisted as a condition for renewal that there be a reduction in the amount of the original indebtedness. Newport thereupon contacted several persons who frequently loaned money, and sought a loan of $1,000, offering the property as security. In all of these efforts he was unsuccessful, and finally he approached appellee. Appellant Newport testifies that he advised appellee that he desired to obtain a loan of $900, and that appellee agreed to make the loan. He says: "I told him I wanted to give him security for his loan and would verify it out with a warranty deed." He testifies that the warranty deed and contract were prepared by appellee's attorneys and were brought to him by appellee to be signed; that he demurred because the instruments did not appear to be a mortgage, and that appellee assured him that it was just another form of mortgage, and acting upon that assurance appellants signed the instruments; that at no time did he ever make appellee a proposition to sell the property at any price, and that there was no agreement between him and appellee for the sale of such property.

Appellee, on the other hand, denied that he made a loan to or took a mortgage from appellants; he testified that he refused to take a mortgage, but advised appellant that he would buy the place and sell it back to him at the end of nine months, and that the papers were drawn by Mr. Bare in the office of Bare & Swett in the presence of both Mr. Newport and the witness, and that the papers as drawn revealed the true agreement be-

tween the parties. During the nine-month period appellants were unable to obtain the money necessary to pay appellee for a reconveyance of the property, and they sought further time. Newport testifies that appellee first demanded $300 as consideration for an extension, but being convinced that appellants had no such sum finally agreed to grant an extension to September 1, 1941, on condition that appellants would give him all of the furniture. Appellee denies that he demanded the $300 or the furniture, but he says that Newport stated that he wouldn't need the furniture if he lost the building, and offered to include the furniture in the security if the extension was granted, and that the extension was granted on the conditions set out in the notation indorsed on the copy of the contract held by the escrow agent.

Appellants failing to make the payment in accordance with the terms of the extension agreement, appellee secured from the escrow agent the warranty deed and took formal possession of the property on September 3, 1941. Mr. Newport testifies that this deed was delivered over his protest, but that "after I protested . . . and he had possession . . . I thought it was my duty to pay him some rent, and I paid it. . . . I told him I was releasing the building under protest." Newport says that appellee asked him to suggest what rental he should pay, and that he suggested $25 per month, but that appellee stated he wanted to be lenient, and he would let him have the property for $8 per month; that he occupied the premises for 2 months and paid the $16 rental. After taking possession of the property appellee began to make repairs and improvements thereon. Appellant Newport admits that he was aware that appellee was making these improvements. The record discloses that Newport voluntarily moved out of the building and surrendered possession to appellee, and that until the filing of this suit some 16 months later he asserted no claim to any interest in the building or an equity of redemption.

Witness Lamar testified that Newport told him that he had given up, and was going to turn the property

over to appellee and quit; that witness saw Newport again some two weeks after he had turned the building over to appellee, and that Newport at that time told him that he wished he had turned it over a long time ago; that appellee had treated him fair and like a brother, and that he hoped appellee could make some money out of the property.

Reference to the testimony relating to the market value and the rental value of the property will be hereinafter set out.

The trial court found that, under the circumstances, the transaction constituted an absolute conveyance and not a mortgage to secure a debt. Appellee suggested, however, that he was willing that appellants should recover the property if they fully reimbursed him for all sums laid out, together with interest thereon, and asked the court to state an account thereof. In compliance with such request the court found that the sum of $2,745.20 represented the net amount to which appellee was entitled and allowed appellants 60 days within which to pay same, together with interest at 8 per cent. per annum, and directed that if same was paid within such time that appellee should execute a deed to appellants, and if not paid within that time, then that appellee's title should be forever quieted and confirmed as against any claim of appellants.

In the case of *Clark McWilliams Coal Co.* v. *Ward*, 185 Ark. 237, 47 S. W. 2d 18, Chief Justice HART said: "The general doctrine prevails in this state that the grantor may show that a deed absolute on its face was only intended to be a security for the payment of a debt and thus a mortgage. Since the equity upon which the court acts arises from the real character of the transaction, any evidence, written or oral, tending to show this, is admissible. If there is a debt existing with a loan of money in advance, and the conveyance was intended by the parties to secure its payment, equity will regard and treat an absolute deed as a mortgage. However, the presumption arises that the instrument is what it purports to be; and, to establish its character as a mort-

gage, the evidence must be clear, unequivocal, and convincing. By this is meant that the evidence tending to show that the transaction was intended as a security for debt, and thus to be a mortgage, must be sufficient to satisfy every reasonable mind without hesitation. . . .

"However, every case must, of necessity, depend upon its peculiar circumstances. No fixed rule can be laid down by which it can be ascertained with mathematical certainty whether the proof has met the test above described. In the very nature of things, no decisive standard can be laid down to determine the sufficiency of the evidence. The reason is that the facts and circumstances stand in different relation to each other in separate cases, and what might satisfy the mind standing in a certain relation to surrounding facts and circumstances might not be clear and decisive proof in another case. Like any other fact to be proved by evidence which satisfies the mind of its truth, the proof may be inferred from the attendant circumstances and often cannot be proved in another way."

It is unquestionably within the power of two individuals, capable of acting for themselves, to make a contract for the purchase and sale of land, with a reservation to the vendor of a right to repurchase the property at a fixed price and at a specific time. If such transaction is security for a debt, then it is a mortgage, otherwise it is a conditional sale. In practice the line of demarkation between a mortgage and a sale with a right of repurchase is shadowy, and it is frequently a matter of great difficulty to determine to which category a given transaction belongs. *Matthews* v. *Stevens,* 163 Ark. 157, 259 S. W. 736; 36 Am. Jur., Mortgages, § 164.

All of the cases agree that in order to establish that a deed absolute in form was in fact a mortgage there must be clear and decisive evidence of the existence of a debt which the parties intended should be secured by such instrument of conveyance. In other words, if there is a debt subsisting between the parties and the deed is given to secure the debt, the deed is a mortgage. *Stryker* v. *Hershy,* 38 Ark. 264; *Hayes* v. *Emerson.* 75

Ark. 551, 87 S. W. 1027; *Beloate* v. *Taylor*, 202 Ark. 229, 150 S. W. 2d 730. In the case of *Hayes* v. *Emerson, supra,* the court held that a contract by which the grantee agreed to resell to grantor at the same price does not necessarily destroy the character of the deed as an absolute conveyance.

One test which may be applied in determining the nature of the transaction is whether there exists mutuality and reciprocity of rights between the parties. In other words, it may be helpful to determine whether the grantee has the right to compel the grantor to pay the consideration named in the stipulation for reconveyance. If he can compel such payment the transaction is generally regarded as a mortgage, while if he cannot compel such payment the transaction is generally regarded as a conditional sale. 36 Am. Jur., Mortgage, § 167.

In the case of *Beloate* v. *Taylor, supra,* we quoted from *Johnson* v. *Clark,* 5 Ark. 321, as follows: " 'In the case at bar, Clark executes the conveyance which he calls a bargain and sale, and he accompanies the same by a delivery, reserving to himself the right to repay the purchase money within twelve months. But he executes no covenant by which he acknowledges an indebtedness nor can it be gathered from the instrument that there is any certain obligation on his part to do so. By repaying the money he has a right to demand possession of the negroes, but should he fail to do so where was the remedy to Johnson? Had he any contract which he could enforce *in personam or in rem?* We are of the opinion that he had not.' "

Because of the fact that Johnson could not require Clark to repay the money it was held in that case that the instrument was a conditional sale and not a mortgage.

In the case at bar, appellants did not execute a note or other evidence of indebtedness, and there is certainly no express promise by which they agreed to repay the $900 and interest in any event. While his answers are

somewhat evasive, we gather from the testimony of Mr. Newport that he construed the agreement as giving him the right to pay the amount and reacquire title to the property, but that he was not obligated to pay the same in any event. We quote some of his testimony as follows: "Q. But you gave him nothing . . . like a promise that you would pay him money? A. But I gave him security. Q. . . . Was there anything Chandler could do . . . to make you pay him that money? A. He held my security until I did pay him. Q. What do you understand that Chandler could do if you failed to pay him? A. I thought I had the privilege of the mortgage redemption law for an extension, whatever a mortgage would grant a man, I thought I had that privilege. Q. Now, when you handed Chandler that deed and contract when you signed it and placed it in the hands of Bare & Swett to hold during the nine months that you had in which to pay back, at that time did you owe Chandler any money, or was it another of those debts that you had made before? A. I never owed Mr. Chandler a bill in my life that I didn't pay. Q. I'm talking about the bank, did you have that understanding? A. No, I didn't owe him any money. He knew he had good security for what he had. Anybody would know he had good security."

The burden was on appellants to show that the deed was in fact a mortgage, and to discharge this burden they were required to show that they were indebted to appellee and the instrument secured such debt. *Beloate* v. *Taylor, supra; Hayes* v. *Emerson, supra; Rushton* v. *McIlvene,* 88 Ark. 299, 114 S. W. 709. Mr. Newport does not testify expressly that he was under legal obligation to pay in any event. No other witness testifies that a debt existed. If this had been an action brought by appellee to recover for money loaned, and the evidence had been the same as disclosed by this record, appellee in all probability would have been unable to recover.

Appellants argue that appellee's words: "I hereby agree to extend the payment of the within obligation,"

employed in the notation extending time, shows that the agreement was a mortgage for they say ''obligation implies a debt. The word is undoubtedly often so used, but the use of that word is not conclusive. The word ''redeem'' quite frequently suggests the existence of a debt, yet it has frequently been held that the word may be treated as being synonymous with ''repurchase.'' *Stryker* v. *Hershy,* 38 Ark. 264; *Dicken* v. *Simpson,* 117 Ark. 304, 174 S. W. 1154; *Matthews* v. *Stevens,* 163 Ark. 157, 259 S. W. 736. So here, in view of the fact that there is no other evidence that an indebtedness existed, the word ''obligation'' may be treated as denoting ''consideration.''

The record here discloses some circumstances which the courts have treated as tending to establish a mortgage, and, also, it reflects circumstances which the courts have considered as tending to establish conditional sales. It would unduly prolong this opinion, and serve no useful purpose to recount these circumstances. In view of the emphasis which appellants place upon it, we feel that it would not be amiss to discuss one such circumstance in some detail. One of the recognized tests on the issue of mortgage or no mortgage is the relationship between the consideration for the conveyance and the actual value of the property conveyed. 36 Am. Jur., Mortgages, § 153; *Scott* v. *Henry,* 13 Ark. 112; *Clark McWilliams Coal Co.* v. *Ward, supra; Sturgis* v. *Hughes, ante,* p. 946, 178 S. W. 2d 236. As before stated, the original cost of construction was large. Some of the witnesses estimate the original cost to have been between thirty and forty thousand dollars. Four witnesses testified on behalf of appellants, and undertook to fix the value of the property as of October, 1940, the date of the conveyance. Mr. J. A. Secor testified that in his opinion the property was worth between seven and eight thousand dollars. On cross-examination he testified that he had been a building contractor in Tulsa, Okla.; that he moved to Eureka Springs in December of 1942, and that he had no knowledge of the value of property in Eureka Springs as of October, 1940. Mr. John Jennings testified that he had lived in Eureka Springs as a boy and had returned about six and one-

half years ago; that he had been in the real estate business in Chicago, St. Louis and other places, and that in his opinion the sound value of the property would be between four and five thousand dollars. On cross-examination he admitted that he knew of no sales of buildings of that character and that he was giving what he regarded to be the sound value and not the sale value of the property, and that he did not know the actual market value thereof. A carpenter and painter testified that in his opinion the property was worth eight thousand dollars. On cross-examination he admitted that he did not know the rental value of the property, how much the taxes were, nor the condition of the building, that his testimony was based upon the character of the building rather than from what buildings were worth in Eureka Springs. Chester Wood, who had been engaged in construction for about 15 years, testified that he had carefully examined the property in 1928, and that he had observed it from the outside recently, and that he believed the value thereof to be between seven and eight thousand dollars. On cross-examination he admitted that he knew of no sales in Eureka Springs in 1940 or 1941. Mr. McGinnis testified on behalf of appellee that he had lived in Eureka Springs several years and was living there in 1940 and '41; that he was familiar with the value of property in Eureka Springs, and did not regard the property as worth $1,000 in October, 1940, or at the time of the trial; that he himself owns three pieces of business property; that the town was just about at its lowest ebb in 1940 and '41, and that the property situated therein was worth virtually nothing. Mr. John Lamar testified for appellee that property in Eureka Springs was worth practically nothing in 1940; there was no sale for such property then or now.

The fact that the bank was unwilling to renew its loan without a substantial reduction; the fact that appellants were unable to find anyone who would lend sufficient money to pay appellee $900 and accrued interest is strongly indicative that the sum of $900 closely approximated the true value of the property,

There is in the record some evidence as to the rental value of the property. Mr. Newport fixed the value at $75 per month, but although he stated he had his books he failed to show where he had obtained any such rental out of the building since the first world war. Mr. Chester Wood was of the opinion that properly managed the building should bring that sum of money per month. Mr. McGinnis testified that he did not know of any building in Eureka Springs bringing $75 per month rent; that he did not believe there was any such building regardless of how small or how large. Mrs. Ethel Swett, a member of the firm of Bare & Swett, real estate agents, who is engaged in the renting of property, testified that there had been no demand for property like this bathhouse; there hadn't been any occasion to rent property of that size; that there was nothing to use it for.

In the course of the oral argument before the court, counsel for appellants, in answer to a question propounded by a member of the court, admitted that if the decree of the lower court was reversed with directions to declare the deed a mortgage, that appellants would be able to realize little if anything from their equity of redemption unless appellee was charged with a substantial amount as rent which he should have collected, but admittedly did not, collect. Counsel argued that appellee as a mortgagee in possession is chargeable with the full reasonable rental value of the property even though he had not received the same. In view of the conclusions which we have reached with respect to other issues, it is, of course, unnecessary for us to determine whether appellee should be charged rents on that basis or on the basis of actual receipts, and it is also unnecessary for us to determine who has the burden to show what the true rental value of the property is. Since Mrs. Swett's testimony, to the effect that there was no demand for rental property of this character, is uncontradicted it appears that there would be no basis on which appellee could be charged for rents not actually collected by him. As before stated, however, this question is not material to the decision of the case.

A consideration of all of the facts and circumstances disclosed by this record relating to the value of the property leads to the conclusion that the property was worth little, if any, more than $900 at the time the deed and contract were executed.

After a careful review of the testimony we are unable to say that the finding of the chancellor that the transaction was a sale, and not a mortgage to secure a debt, is contrary to the preponderance of the evidence, and such finding, while not conclusive, is persuasive, and the decree is, therefore, affirmed.

ROBINS, J., concurs.