EHRLICH *v.* CASTLEBERRY.

5-1178                                    299 S. W. 2d 38

Opinion delivered February 25, 1957.

*Bailey, Warren & Bullion,* for appellant.

*Langston & Walker,* for appellee.

MINOR W. MILLWEE, Associate Justice.    This is a suit by appellee, Precious Castleberry, to have a deed and two allied instruments declared a mortgage, and for an accounting and recovery of an alleged overpayment of the mortgage indebtedness to the appellants, Nates Ehrlich and L. A. Gardner, doing business as Arkansas Paint & Roofing Company.    Appellants defended on the ground that the transactions in question constituted an absolute conveyance of the property to them and asked that their title thereto be quieted.

At the conclusion of the trial on April 18, 1955, the late Chancellor Rodney Parham found for appellee and directed that the parties proceed to work out an accounting along specific lines designated by the court in accordance with the evidence.    Judge Parham had been forced by illness to leave the bench by the time an agreement was reached on the accounting feature.    Original counsel on both sides withdrew from the case and pres-

ent attorneys were employed. This appeal is from a formal decree entered by Chancellor Rorex on May 28, 1956, in which a deed, rental agreement and option to purchase were construed, and reformed to read, as a mortgage upon which appellee still owed a balance of $1,801.69 as of April 10, 1956. Since there is no dispute as to the amount of the indebtedness, if any, the sole issue is the correctness of the holding that the transactions in question should be construed as a mortgage.

The evidence reflects that appellee is a Negress with a limited education and slight familiarity with legal transactions. In 1945 she purchased two adjoining lots situated at 1500 and 1502 East Second Street in Little Rock, Arkansas, for $2,700. Each lot had a small house on it. Appellee lived in one of the houses and conducted a small business of some sort in the other. Appellants are partners engaged in the sale of building materials and as general contractors specializing in home construction and repairs. They also make loans to owners who desire to improve or repair their property. Appellant Ehrlich is in charge of the business and office work while Mr. Gardner looks after construction.

In March, 1951, appellee had become delinquent on the monthly purchase money payments on the two lots upon which she still owed a balance of $768.00. In an effort to meet three delinquent monthly payments and satisfy the demands of a tax title purchaser for $250.00, appellee approached appellants about a loan. While there is a sharp dispute in the testimony concerning the negotiations at that time, it is clear that appellee had no intention of selling her property and sought some arrangement whereby appellants would pay off the indebtedness on the lots, repair the houses, which were in a bad state of repair, and allow appellee to make repayment and redeem her property.

After appellants inspected the property, but before any determination was made as to the amount of the repairs, appellee executed a general warranty deed of the lots to appellants on March 17, 1951. A few days later appellants paid off the balance of the mortgage

indebtedness due by appellee on the purchase price of the lots and $250.00 to the tax title purchaser. On March 26, 1951, the parties executed two instruments designated "Rental Agreement" and "Option to Buy." Under the first instrument appellee was to pay appellants a monthly rental of $116.67 for the two lots. The second instrument provided that appellee should notify appellants not later than April 1, 1952, of her desire to exercise the option to buy the lots one month later for $9,000 plus 8% interest per annum payable in 120 monthly installments of $109.20 each. In addition appellee was required to pay $15.80 monthly for taxes and insurance. Although appellee sought specific information on, and a contract for, the repairs none was ever furnished or negotiated.

Appellee paid appellants $1,313.24 from March 21, 1951, to April 30, 1952. Appellants also collected an additional $280.00 from a tenant in one of the houses during this period and in May, 1952, appellee paid appellants $125.00 and the tenant paid $35.00. The cost of labor and materials used in repairing the houses amounted to $3,215.

Although no contract to that effect was ever executed, Ehrlich testified that appellants agreed to sell one of the lots to appellee for $13,000 in June, 1952, when they delivered to appellee a small "Customer's Receipt Book" captioned: "8% Purchase Contract, $13,000.00." When asked to explain the sharp increase in price over that stipulated in the option to purchase, Ehrlich stated the sale was subject to appellants' payment of the insurance, taxes and repairs for an unspecified "term of the contract" despite the fact that the insurance and tax payments were already included in the payments appellee was making.

Appellee continued to pay appellants $25.00 weekly from June, 1952, to December, 1954, and appellants credited her with such payments monthly on the booklet they had furnished her. Including monthly rentals of $35.00 collected from a tenant in one of the houses, appellants had been paid a total of $6,003.24 when the in-

stant suit was filed December 8, 1954. After all payments had been credited by appellants, appellee still owed a principal balance of $12,375.14 on only one lot at that time according to the booklet furnished her. The transactions listed on appellants books with reference to the two lots were under the heading, "Castleberry Property," and recited the execution of the deed, rental agreement and option to purchase but made no reference to any contract for $13,000. There is also a ledger notation that in April, 1952, appellee refused to sign a note and mortgage drawn by appellants in connection with the option to purchase.

The legal principles applicable in cases like this were clearly stated by Chief Justice HART in *Clark-McWilliams Coal Co.* v. *Ward,* 185 Ark. 237, 47 S. W. 2d 18, as follows: "The general doctrine prevails in this State that the grantor may show that a deed absolute on its face was only intended to be a security for the payment of a debt and thus is a mortgage. Since the equity upon which the court acts arises from the real character of the transaction, any evidence, written or oral, tending to show this, is admissible. If there is a debt existing with a loan of money in advance, and the conveyance was intended by the parties to secure its payment, equity will regard and treat an absolute deed as a mortgage. However, the presumption arises that the instrument is what it purports to be; and, to establish its character as a mortgage, the evidence must be clear, unequivocal, and convincing. By this is meant that the evidence tending to show that the transaction was intended as a security for debt, and thus to be a mortgage, must be sufficient to satisfy every reasonable mind without hesitation." In that case the court again approved this statement from the early case of *Scott* v. *Henry,* 13 Ark. 112: "And, for the purpose of ascertaining the true intention of the parties, it is a well established rule, that the courts will not be limited to the terms of the written contract, but will consider all the circumstances connected with it; such as the circumstances of the parties, the property conveyed, its value, the price paid for it, defeasances, verbal or written, as well as the acts

and declarations of the parties and will decide upon the contract and the circumstances taken together.'' See also, *Buffalo Stave & Lumber Co.* v. *Rice,* 187 Ark. 731, 62 S. W. 2d 2; *Carpenter* v. *Walker,* 199 Ark. 829, 138 S. W. 2d 68; *Watson* v. *Clayton,* 203 Ark. 1097, 160 S. W. 2d 849; *Newport* v. *Chandler,* 206 Ark. 974, 178 S. W. 2d 240, 15 A. L. R. 1096; *Gray* v. *Butrum,* 217 Ark. 967, 234 S. W. 2d 774.

The question whether a deed to realty, absolute on its face, when construed together with a separate agreement or option to repurchase by the grantor amounts to a mortgage, or is a conditional sale, depends on the intention of the parties in the light of all the attendant circumstances. 59 C. J. S., Mortgages, Sec. 28. It is settled by our decisions that whenever a vendor, at the time of a sale, is indebted to a purchaser, and continues to be indebted after the sale, with the right to call for a reconveyance upon payment of the debt, a deed absolute on its face will be considered by a court of equity as a mortgage. *Matthews* v. *Stevens,* 163 Ark. 157, 259 S. W. 736. As Judge Knox stated in *Newport* v. *Chandler, supra*: ''It is unquestionably within the power of two individuals, capable of acting for themselves, to make a contract for the purchase and sale of land, with a reservation to the vendor of a right to repurchase the property at a fixed price and at a specific time. If such transaction is security for a debt, then it is a mortgage, otherwise it is a conditional sale. In practice the line of demarkation between a mortgage and a sale with a right of repurchase is shadowy, and it is frequently a matter of great difficulty to determine to which category a given transaction belongs.''

We are convinced that the evidence here is of that clear, cogent and convincing character necessary to support the trial court's conclusion that the deed and allied instruments were actually intended as a mortgage. Appellants cite several cases holding that before reformation of a written instrument is authorized there must be either a mutual mistake of the parties, or a mistake on one side and fraud or inequitable conduct on the other.

It is clear from the evidence that appellee never intended a sale of her lots to the appellants and their awkward effort to extract $13,000 plus 8% interest from her for only one of the lots, under the circumstances, amounts to something less than equitable conduct.

In reaching the conclusion that the instant transactions were intended as a mortgage, we share the views expressed by Judge Butler in *Buffalo Stave & Lumber Co.* v. *Rice, supra*: "In reviewing the decisions of courts of chancery on questions of this character, great weight should be given to the opinion of the court as the presiding judge may be fully apprized of the existence of circumstances which but dimly appear to us from an examination of the record. The learned chancellor had an intimate knowledge of the instant case from its inception and of the character and situation of the parties and the course of the lawsuit. He interpreted the instruments, viewed in the light of the attendant circumstances and the evidence adduced, as a security for a debt, that security having been changed from the lien given by the court by instruments which were in effect nothing more than a mortgage. He concluded that this was the intention of the parties, and we are unable to say, after a careful consideration of the record before us, that he has wrongly decided."

The decree is affirmed.