
# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-16-1142

| | |
|---|---|
| MARK WESLEY SILVA AND SILVA PROPERTIES, LLC<br><br>APPELLANTS<br><br>V.<br><br>GAY LYNN NAPIER, INDIVIDUALLY AND AS TRUSTEE OF DENNIS AND GAY LYNN NAPIER REVOCABLE TRUST U/T/D 11/5/99<br><br>APPELLEE | **Opinion Delivered** September 6, 2017<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72CV-14-767]<br><br>HONORABLE JOHN C. THREET, JUDGE<br><br>AFFIRMED |

**N. MARK KLAPPENBACH, Judge**

This appeal arises from a money-making scam perpetrated by eighteen-year-old Daniel Davis that eventually resulted in his conviction and imprisonment. Appellee Gay Lynn Napier is Davis's grandmother. Appellant Mark Silva is an older friend of Davis's. Both Napier and Silva claim to be victims of Davis's scam, and each alleges that the other was a co-conspirator with Davis. Once Davis's scam was exposed, Napier filed suit against Davis and Silva seeking, among other claims, to set aside a deed conveying her house to Silva.[1] Silva now appeals an order of the Washington County Circuit Court setting aside the

---

[1] Napier filed suit against Silva, Silva Properties, LLC, Davis, and Cathryn S. Fetner, seeking cancellation of the deed, replevin of four vehicles, and compensatory and punitive damages. Silva filed a counterclaim against Napier and a third-party complaint against Davis and his mother, Jania Davis. The issue of cancellation of the deed was tried separately, and ultimately a Rule 54(b) certificate was issued, resulting in the current appeal.

SLIP OPINION

warranty deed.  We affirm.

Napier testified that Davis had tricked her into believing that he had joined the United States Army, specifically the "special forces," and that she could not tell anyone. Davis put on a charade for Napier by coming home in the middle of the night and retrieving his "service pistol" from the gun case, ordering Napier to other rooms of the house when people visited, and ordering her not to look out the window to see what transportation he was using because she had not signed confidentiality papers.  Davis used his lies to get money from Napier by convincing her that she had to pay for his training, that he needed a series of new army-approved vehicles, and that he needed $174,000 for ankle surgery to stay in the army.  When Napier questioned why she had to pay for training, Davis produced an official-looking letter assuring her she would be repaid by the army.  Napier testified that when she did not believe things Davis told her, he would get rough with her and then talk to his "commanding officer" on the phone and return with answers that made sense.  Napier testified that he would get in her face, grab her shoulders, shove her, slap her, call her names, and give her a cold stare.  Napier drained her savings and borrowed large sums of money from family and friends while Davis convinced her that the army would repay her.

Davis, who was serving a ten-year prison sentence in the Arkansas Department of Correction at the time of the trial, admitted that he used physical abuse and intimidation to enforce his lies and manipulate his grandmother.  He said that eventually he could make her do what he wanted just by looking at her.  Davis testified that he knew his family wanted

SLIP OPINION

him in the military because of his temper, and he used that against them, although he claimed that Silva came up with the lie about the army.

Over the course of a few months, Napier purchased four new vehicles on credit for Davis that Davis in turn sold to Silva: a GMC truck, a Dodge truck, a Corvette, and a Chevrolet truck. Napier said that Davis told her he needed a vehicle that met certain criteria for the army and that the army would pay for it when he went to college. Davis claimed that the army was not happy with the vehicles they bought in order to get Napier to buy the next one. Napier testified that Davis told her that the army had altered her credit score to allow her to buy the vehicles. Napier said that Davis made phone calls to his "commanding officer," Mark, when they were car shopping, but he would not let her hear the conversations. Napier said that she did not make the connection between "Mark" the "commanding officer" and Mark Silva.

According to Davis, Silva became involved with the vehicles when he asked about buying the GMC truck, which Davis had wrecked. Davis testified that Silva told him there was a way that Silva could get the vehicles, Napier would not have to worry about paying them off, and Davis would not get in trouble. Davis claimed that prior to the purchase of the Dodge, the Corvette, and the Chevrolet truck, there was a deal in place with Silva to buy the vehicles on Napier's credit and sell them to Silva. Davis said that he knew he was selling Silva cars without titles, but he just wanted the money. Phone records showed fourteen text messages and/or phone calls between Davis and Silva on February 11, 2014, the day both the

Corvette and the Chevrolet truck were purchased. Davis said that they were communicating about which cars to buy.

Davis and Napier both testified that Napier was not involved in the sale of the vehicles to Silva aside from overhearing the men talking about selling the Corvette. Napier testified that when she heard Davis offer to sell the Corvette for $25,000, she "hit the ceiling" over the offer to sell a $90,000 car for $25,000 and forbade it. The men completed the sale while Napier was in another room. Davis told Napier that the price was none of her business and that the army would take care of it. Napier testified that the cars were titled in her name and that she did not authorize any sale to Silva, but Davis told her that the army was paying off the vehicles and could sell them without her signature.

According to Davis, the deed at the heart of this appeal came into being because Silva said he needed collateral before purchasing the last two vehicles, and Davis suggested using the house. Napier testified that Silva came to her house one day with a paper for her to sign and told her it was so he could get the titles to the vehicles. She said that Silva put the paper on the counter top and stood beside her where she could not move. She said that Silva and Davis both ordered her to "just sign it" and would not let her turn the light on. Napier claimed that it was dark, but she could see that there was no writing on the paper, just a line. She said that Davis gave her a "dark look," and she knew she would have to deal with his temper if she did not do as he said. Napier said that when Silva was leaving he said that the paper was a quitclaim deed but he was not going to file it. She asked Davis if she was going

to lose her house and he told her no. At this point, Napier thought the army was still taking care of everything.

Davis said that Silva said the paper was some kind of deed to the house. Davis said that he turned the lights off when they went into the kitchen and that he and Silva trapped Napier and did not allow her to turn the lights on or get her glasses. Davis testified that there were lines at the bottom and something at the top, but most of the paper looked blank. He said that both he and Silva ordered Napier to sign the paper.

Davis later confessed his lies to Napier and threatened to shoot himself. He was hospitalized for two days, and when he was released Napier took him to the police. Two letters that Davis wrote while in the county jail were introduced as evidence. In the first, Davis apologized to Napier, Silva, and others. In the second, Davis wrote that he had told Napier he was selling the trucks for surgery money and had asked her to use the house deed for collateral. He wrote that Napier was not forced to sign the deed and that Silva was not involved in his lies. Davis testified that he sent this letter to Silva to show that they were on the same side and to get Silva to bond him out of jail. Davis said that he had been willing to say anything to avoid going to prison and that Silva told him he would help. A recorded jail phone conversation between Davis and his aunt was played at trial in which Davis stated that they did not force Napier to sign the deed, but Silva had lied to her and she did not know what she was signing.

Jania Davis, Napier's daughter and Davis's mother, testified that she believed her son's

lies about being in the military. She said that she told Silva the vehicles were being paid off because that is what Davis instructed her to do. Jania said that Napier told her that Silva may bring over papers to sign as collateral until she was able to get the car titles from the military. Jania said that she did not know it was a deed at that time, but she told Napier not to sign anything without having it checked out. When she talked to Napier afterward, Napier was very upset and said it was dark and that she did not know what she had signed, but when Silva walked out the door he said something about a quitclaim deed. Jania acknowledged that the only thing Napier would have to put up as collateral was the house.

Silva denied being involved in Davis's scam, denied telling him what cars to buy or that he would take care of the titles, and denied forcing Napier to sign the deed. Silva testified that he bought and sold cars for a living and that Davis offered to sell him the wrecked GMC truck for $20,000. Silva bought the GMC and later bought the Dodge truck for the same price. He said that Davis and his mother told him that the family was paying off the vehicles and guaranteed he would get the titles. Silva acknowledged the communications between him and Davis on the day the Corvette and the Chevrolet truck were purchased but claimed he was not ordering Davis to buy the cars for him.

Silva testified that Napier gave him her house deed and her husband's death certificate in order for him to have a deed made up after he had told her he needed collateral before buying the last two vehicles. He said that he told Napier he would go to the police or file suit against her if he did not get the deed. He claimed that she willingly gave him the

SLIP OPINION

documents to have the deed drawn up and willingly signed the deed, not a blank piece of paper. He said that the light was on and that she knew exactly what she was signing. He told her that he would not file the deed if she got him the titles. Silva said he paid $40,000 for the last two cars. He admitted that he got a good deal on the cars but claimed that Davis had told him the prices were the payoff amounts. Silva claimed that Napier was aware of all of the deals.

Silva's wife, Debra Silva, testified that she was with her husband when Napier gave them the documents to have the deed drawn up and when Napier signed the deed. She testified that she watched from the living room while Napier signed the deed in the kitchen with the light on; that Silva told Napier what it was and where to sign; and that Davis told Napier to stop asking questions and just sign. Debra Silva said that the men did not touch Napier or force her to sign. Napier and Davis both denied that Debra was at the house when the deed was signed. Napier testified that she did not give the Silvas documents for the deed but that Davis had access to her safe where those documents were kept.

The circuit court entered an order setting aside the deed. The court found that there was clear and convincing evidence that Napier had no intent to pass title "immediately or otherwise." The court noted several pieces of evidence it found credible that demonstrated lack of intent: (1) the statement by Davis in his jail phone call that Napier had no idea what she was signing; (2) Debra Silva's testimony that Napier was told to stop asking questions and to just sign it; (3) Napier's and Davis's testimony that Napier did not understand what she

SLIP OPINION

was signing and did not intend to relinquish control of her home; and (4) Napier's and Davis's testimony that Davis used duress, undue influence, and fear to control Napier and force her to do what Davis wanted. The court also found that there was no legally sufficient consideration for the deed.

We review a circuit court's findings of fact after a bench trial to determine whether those findings are clearly erroneous. *Hearne v. Banks*, 2009 Ark. App. 590, 376 S.W.3d 444. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. Recognition must be given to the circuit court's superior opportunity to determine the credibility of witnesses and the weight to be given to their testimony. *Id*.

Silva argues that because the deed was intended to be a security, the circuit court should have found the deed to be a valid mortgage. This court has held that if there is a debt existing and the conveyance was intended by the parties to secure its payment, equity will regard and treat an absolute deed as a mortgage. *Wensel v. Flatte*, 27 Ark. App. 5, 764 S.W.2d 627 (1989). The party claiming that the deed was a mortgage has the burden of showing that the deed was, in fact, a mortgage, that there was an indebtedness, and that the deed was intended to secure the debt. *Id*. The presumption arises that a deed is what it purports to be, and to establish its character as a mortgage, the evidence must be clear, unequivocal, and convincing. *Id*. The question whether a deed to realty, absolute on its face, when construed together with a separate agreement or option to repurchase by the

SLIP OPINION

grantor amounts to a mortgage or is a conditional sale, depends on the intention of the parties in the light of all attendant circumstances. *Duvall v. Laws, Swain & Murdoch, P.A.*, 32 Ark. App. 99, 797 S.W.2d 474 (1990).

Silva argues that the circuit court's findings that there was insufficient consideration, and that Napier did not intend to pass title immediately, support the conclusion that the deed was intended to be a mortgage. *See Newport v. Chandler*, 206 Ark. 974, 178 S.W.2d 240, 245–46 (1944) ("One of the recognized tests on the issue of mortgage or no mortgage is the relationship between the consideration for the conveyance and the actual value of the property conveyed."). Silva contends that Napier owed him the title to the vehicles, and although she did not intend to deed him her house outright, she did intend to use the deed as collateral.

The circuit court, however, accepted as credible the evidence that Napier had no idea what she was signing, that she was told to stop asking questions and "just sign it," and that Davis used duress, undue influence, and fear to control her. Just as these findings do not support a conclusion that Napier intended to deed her house to Silva outright, they also do not support a conclusion that Napier had the requisite intent to execute a document securing payment of a debt. Silva points out inconsistencies in Napier's and Davis's testimony, arguing that it could not be true both that it was too dark to read the deed and that the deed was blank. Further, pointing to Jania's testimony, he claims that Napier knew that the only thing she had to use as collateral was her house. This court, however, defers to the superior

9

SLIP OPINION

position of the circuit court to assess the credibility of the witnesses. *Hearne*, 2009 Ark. App. 590, 376 S.W.3d 444. We cannot say that the circuit court's order setting aside the deed was clearly erroneous.[2]

Affirmed.

VAUGHT and MURPHY, JJ., agree.

*Doss Law Firm*, by: *D. Westbrook Doss, Jr.*, for appellants.

*Erwin L. Davis*, for appellee.

---

[2]Silva also argues that a conclusion that Napier did not know what she was signing is an issue of mental capacity that was not raised at trial. This argument is misplaced. The circuit court noted that there were issues of duress, fraud, and undue influence and ultimately based its finding on lack of intent, not lack of mental capacity.